The fourth and final case of the day, 18-12679, Rojas v. City of Ocala. And take your time, but I see that we have Ms. Sutherland here for the appellant, Ms. Miller here for the appellee. Sutherland, correct pronunciation, very well. You may proceed whenever you're ready, no hurry. In the fall of 2014, when the City of Ocala experienced several shootings that resulted in injury to two young children and an infant, the police department immediately responded by employing numerous methods to apprehend the suspects. At the time, tensions were very high and the police faced significant challenges in convincing witnesses to come forward. The vigil that was held here by the community and supported vocally by the police department is no different. Counsel, I think we've got that. If you could get to the issue. Sure, Your Honor. So, the first issue, obviously, is one of standing. A more modest approach on standing is required. When you say more modest, you mean more modest than what? I mean, are we not sort of hemmed in on standing by Rabin, Kondratyev, and the others? So, it's very true that there's a significant contradiction between Valley Forge, Rabin, and Kondratyev. But, you know, our case is post-date Valley Forge. Look, you know, I've been there, right? And I've said I don't quite understand, but we've said what we've said in Rabin and Kondratyev. And, fortunately, in this case, the facts are so different that you aren't hemmed in by Rabin or Kondratyev. Here, plaintiffs face a significant challenge because their standing is based on what can only be described as manufactured standing. Their contact with the one-time community prayer vigil was both voluntary and intentional. Plaintiffs assumed a special burden to attend the vigil, and plaintiffs admit that their purpose in attending was, in part, to observe what they believed would be offensive conduct. So, I'll have to confess, like, I agree with you. At least, I am sympathetic to your view about Mr. Rojas. That is a startling thing to say in a declaration. I went to see if there were going to be any violations of the establishment laws. You know, Ms. Hale also said I attended because I wanted to observe what happened to see how religious it would be. And to see the extent of city and police involvement, I also felt that my personal presence would be a form of protest. In fairness, though, maybe it's Mr. Hale, Mrs. Hale, one of the Hales, don't either one of them or both of them say, like, I've got a legitimate interest in being there, I care about violence in the community, I really would have liked to have participated, but I felt excluded once I was there. So, can we sort of paint with so broad a brush to say they were all just there manufacturing their own standing? I do believe that Mr. Hale and Mrs. Hale both testified that they were concerned about community violence, and that they wanted to participate in the vigil. They are also clear, however, that they went to the vigil to express their opposition to what they knew would occur, which is a prayer vigil. Mr. Hale, who has now passed away and is no longer a plaintiff in this lawsuit, also indicated that he and his wife spoke with Chief Graham at the prayer vigil and was able to dialogue with him and talk with him about the community events, also another event that was coming up. So, I think all of those facts combined indicate that there was no attempt to be a part of the vigil in attending. The intent was always to oppose it and express their opposition to it. And I think, obviously, this Court's holding in Raven and Condrayeb distinguishes between a mere offense and a metaphysical and spiritual injury. And when you look at the cases that have found a metaphysical or spiritual injury, there are several common components to those cases. There's regular contact. Most of the plaintiffs either had to assume a special burden to avoid it, or they were encountering the cross monuments, and all of them are monument cases for the most part, two are legislative prayer cases, but they had to encounter those on a regular basis. None of these cases involved a single event, and in none of these cases did the plaintiffs testify that their intention was to assume a special burden and encounter the constitutional violation or the alleged constitutional violation. So, can I just ask you a quick question about that? I mean, is your point about the single incident or repeated sort of offense, that a single  thing? That just seems sort of like an odd way to think about indicating constitutional rights. I think it depends on the facts, and this Court has actually emphasized in two cases, two establishment clause standing cases, that the facts and the context of a particular case matter. And you can't just pull one fact out and decide the case on that single fact. So, when you look at all of the facts and you consider, well, what does, and Your Honor has noted, it's very difficult. What does, what is the difference between mere offense and metaphysical and spiritual harm? And again, I think the common component is that you encounter it over and over again, or you have to go out of your way not to encounter it, or in your daily activities, you have to regularly view it. And so, I think that's what amounts to a metaphysical or spiritual harm. There's actually no allegation of metaphysical and spiritual harm here. I think the only allegation is that they were offended and they disagreed with it. So, I think that's the distinction. So, I would have thought, just to play devil's advocate for a minute, I would have thought that one distinction might be in rethinking about Valley Forge. Did the plaintiffs in Valley Forge, it was something about the use of property or something, right? Did they ever sort of like witness the violation occurring, so to speak, or was it something that was just sort of within their knowledge, that this property is being misused or some such? And, I mean, I wonder if the difference between psychological and spiritual is that psychological is something that is just a figment of your imagination. I know this is happening somewhere in the world and it disturbs me. And spiritual is like, holy cow, I'm seeing this thing that offends me. I'm not sure that's a valid distinction, but is that the distinction between Valley Forge on the one hand and Rabin and Kondratiev on the other? I think if you did not have the benefit of a more recent case precedent, Supreme Court precedent, that could potentially be the line that is drawn. But I think with more recent case precedent, when you look at what the court has talked about as far as the difference between, let's say, a student being subjected to a prayer and mature adults being subjected to a prayer, the Supreme Court is not sympathetic to the offense or exclusion when confronted with a prayer is sufficient. Town of Greece, the court in Town of Greece is very, very clear about that. I want to move really quickly to the issue, the Establishment Clause violation, which the landscape, since the District Court issued its opinion, is very different, obviously, now. The plaintiffs demand that and still insist that the Lemon test applies here. At the time the District Court issued its decision, it was somewhat debatable. Legislative prayer cases were determined by history and traditions test. Monument cases, still primarily under Lemon, and it was based upon the monument cases that the court relied and issued its decision. One of the primary considerations was because prayer is quintessentially religious, any involvement by the city or the police department is per se unconstitutional, especially under the Lemon test. I think with the benefit of Marsh, Town of Greece, and most recently American Legion, which refused to apply the Lemon test to monument cases, and the opinion does seem to extend that to monuments, symbolism, and religious ceremonies, that a history and tradition test governs here. When you look at the history and tradition of our nation, calling for prayer and asking citizens to unite and pray in the face of difficult times and crisis, it's very hard to reconcile with the lower court's decision. Can I just ask you to nerd out with me for just a minute about history and tradition? I've never been quite clear about the nature of that analysis. What does that mean exactly? History, I think I understand. History, in the way that originalism is ascendant today, you would look to historical context to understand what the meaning of the phrase, establishment of religion, was ordinarily understood to convey in 1791. What does tradition mean exactly? Does it really sort of boil down to the view, sort of like an American Legion, and that's a tough opinion to make heads or tails of about who's got how many votes for what, but I don't know. If something's pretty old, it's good to go? I think the way the Supreme Court has consistently looked at it, and as they revisited an American Legion in several places in their opinion, is does this practice, has this practice been ongoing for several hundred to 200 years? I mean, some of the examples the Supreme Court provides date back to 200 years. And the point that the Supreme Court has made time and time again, in fact, the point they made in town of Greece is a great example. At the time the First Amendment was enacted, congressional legislative prayer, use of chaplains to offer religious guidance and services, even paid chaplains, that was a practice that was already occurring and taking place. And so clearly the intent of the First Amendment was not to abolish those practices. Whereas with school prayer, there weren't enough schools at the time. And so when the court refers to history and tradition, I think that's what they're referring to. And... I'm honestly not certain. The examples that we have provided are pretty closely aligned with community vigils. You have presidents that are actively calling for prayer. You actually have presidents who are leading the nation in prayer. You have chaplains, obviously. So your position, so we can understand it, is that what happened in this case, the city of Ocala can make it a regular, first Monday every month, we're going to have a prayer vigil. About all the problems facing our community and all the crime victims and all the violence and the whole business. And we'll have preachers there to lead it. And we'll have police officers praying and the whole business. Y'all come on out. And that doesn't violate the Establishment Clause because of some history and tradition. Here, it's important to note that the facts are a little bit different. Here... Not much. Here, the police department did not plan or lead the vigil. Volunteer chaplains for the police department certainly led the vigil. I understand you took part in the... You can't get past that Facebook page in terms of where the leadership are and the announcement about it and the statements of the chief at that time and so forth. I mean, it makes it very clear that it was sponsored, endorsed, and urged. Participation was urged by the city. If I could... It's loosened a little bit, but certainly to a significant extent. If I could highlight just some of the evidence that's been presented that I think draws the line between a police department supporting and encouraging a tenants' vigil and promoting planning and funding it. There is no evidence to indicate that they were planning and funding it. In fact, the corroborating testimony of the private citizen, Reverend Quintana and Chief Graham all affirmed that the private citizens were the one planning the event. Police regularly were kept informed about how the event would occur, when it would occur, because police, as established in the record, regularly attended these events. So the Facebook post is most akin to a president calling for prayer and inviting citizens to join him. Can I ask you one sort of nitpicky question about the Facebook post? I'm not sure that this is enough, but there is one line in it that I think is pretty troubling. It's on the police department's letterhead, so to speak, signed by the chief of police alongside a community activist, and it says, We're facing a crisis in the city of Ocala in Marion County that requires fervent prayer and your presence. What about the requires your presence piece? This is sort of, I don't want to get too carried away here, but it's sort of like a command to appear. Signed by the chief of police. I think it's more like an invitation. I think urging the community to be a part of it is what was occurring here. There's no testimony by plaintiffs that they felt compelled to attend. They were very clear that they wanted to attend here, that they did not feel required to. They wanted to. And so based upon that evidence, I don't think that even if you were considering what others interpreted the letter to say, that the evidence supports that here. I think it was merely an invitation. And I just want to, if, could I just take one minute to finish? Sure, please. I just wanted to point out that the vigil that occurred here really is no different than hundreds that still, that have taken place for hundreds of years or a hundred years and are still taking place today. Just a few days ago, less than eight miles from here, the Montgomery District Attorney's Office participated in a vigil at the True Divine Baptist Church to remember victims of violence. The District Attorney spoke at the event and a picture of the DA's office symbol was directly behind him, front and center on the stage. Another example, just last month in Indianapolis, city leaders held a prayer vigil at a local church wherein the Indianapolis Metro Police Department Chief spoke from the pulpit and asked the community to step up and help fight crime throughout Indianapolis. I think these are just a few examples of the history and tradition. Therefore, therefore, counsel, therefore what? Therefore. In Indianapolis, it happened in Montgomery, therefore it must be a constitution. Well, I think it's. I've never heard Montgomery held up. I think what it supports is that there is history and tradition here. And the history and tradition test is the proper test to apply here when considering an establishment clause violation. Just last, or just three days ago, in oral arguments for the Supreme Court, Coach Kennedy's prayer case was presented. And if there was any doubt about whether Lemon still applied, at least to this line of cases that apply here, Justice Kavanaugh noted that it's been more than two decades since the Supreme Court has applied the Lemon test. And so based upon those facts, based upon Marsh, Town of Greece, American Legion, I think the history and tradition test applies here. Okay, very well. You have your three minutes of rebuttal remaining. Ms. Miller, let's hear from you. Good afternoon, and may it please the Court. I will address some of the points that my friend made, but I will start off by just and that when the government overreaches and attempts to influence and control the people's prayer, it usurps its authority under the Constitution and violates the First Amendment as well as undermines the fabric of our republic. Allowing the church, allowing the government to take autonomy, take control and ownership over prayers and to promote that in a way that manifests itself in an hour-long religious service for 700, 500 to 700 people in the heart of town. Can I ask you a favor? Before we get there, let's talk about standing, sort of blocking and tackling of standing. So should I be as troubled as I am by the Rojas affidavit, which I do find just stunning? And it's candor, A plus for candor. But, you know, I went to see if they would violate the Establishment Clause. Your Honor, a few things. There's been no overruling of that standard. And you are correct that in Valley Forge, there was no contact whatsoever. These folks have been community members for seven to ten years. The Hales testified they'd been taxpayers for seven years. There's nothing in the law that says you can't go witness your government violating the Constitution. Hold on one second. I get the Hales. I think you may be right about the Hales, but I'm curious about Rojas and the limits of the standing principle that you're advocating. What about Rojas? Does he say that he was a community member, cared about violence, any of that stuff? Yes, he did. They all testified. And the district court found that the plaintiffs were completely credible. The Hales had lost a son or a child to murder. And they were all here saying, we want to help the community. Jean Pergle, who also passed away, one of our plaintiffs, she also testified that she was there as an interested citizen who wanted to curb the crime. These are all— Tell me what Rojas said. What I recall Rojas saying was something to the effect that he was interested to see the extent to which they were violating the Constitution. Yeah, right. Anything else? That's my question for you. I'm not making you troubling, to be honest. If you're troubled by the fact that they said, you know, we're going to the nuisance, if that's the concern, there's nothing in the law that says you can't go and be a citizen. Counsel, I have the same problem with Mr. Rojas. Okay. You can manufacture your claims. You can run around the country and manufacture claim budgets going there in order to have a claim. I see what you're saying. He's following unity. Suppose those were the facts. We write the opinion that he manufactured his claim. Yeah, you wouldn't want that. That's Valley Forge. You wouldn't want us to write that. That's Valley Forge where the folks are outside of the community. But these are taxpayers. They are residents of Marion County. They were invited by the police chief of their own community to attend this event. And they actually dialogued with the mayor. They had so many chances to cancel this event. It shouldn't have happened. And they said, there's not multiple community organizers. Forge said they were forced to choose, that Rojas was forced to choose. To attend or not to attend. I don't see how he was forced to do anything. He voluntarily appeared for the purpose of seeing whether or not the Constitution would be violated. Ultimately, Your Honor, we can set Rojas aside because the law is... How about forced to choose? I believe that I would feel extremely compelled. I would want to go. If my government was a lawyer and a community member, if I knew my government was about to potentially violate the Constitution, I would basically, what you're saying is I'd be foreclosed from going. Because then I would have to preserve my standing to not go. And I don't think that that can be the law either. And I also... Counsel. Counsel. Counsel. You're not addressing the argument. The fact that you would want to go to see if there's a violation only puts you in the same position as Rojas. It doesn't address whether someone who goes to an event expecting that there's going to be a Constitution violation and wanting to subject himself to a Constitution violation so he can sue has standing in the law. I see. It's referred to, and you may not agree with the term, but some people refer to it as manufactured standing. I understand, Your Honor. I believe that... One of these clients said, I wanted to participate individually, but not religiously. Well, she's fighting the hypothetical. From the get-go, this was intended to be a religious event. Everybody knew that. She didn't want to participate individually. She wanted them to have another vigil or a different vigil than this. Yes, Your Honor. Well, the plaintiffs have a right to attend government events free from the government creating... This is a government event. So, you're saying that citizens can't attend a government event because they're not religious? I mean, if this were a Muslim... I'm saying that, Your Honor. Counsel, you don't further the argument by trying to recast the question you just asked. The question is, if someone goes to an event knowing they're going to be offended and thinking that it's worthwhile going because I'll see a constitutional violation and I can sue for it, whether that is the kind of injury in fact, a concrete injury in fact, that is embraced in the standing. Yes, it is, Your Honor. It doesn't mean you can't go or you should go or you shouldn't go or whether you would go. It's a legal issue about what standing requires. Yes. And under the law, it says a direct unwelcome contact. In Pelfrey, this court recognized standing for plaintiffs who witnessed legislative prayers that were given on the government's website. They could have avoided the prayers. This court, as well as other circuits, have repeatedly said that it doesn't matter that the plaintiffs in Establishment Clause cases have somehow sought out the direct unwelcome contact. Here, it's more egregious. Counsel, what's our legal case saying it doesn't matter if the plaintiffs sought out the injury for a standing purpose? There are cases that say that it doesn't matter that the plaintiff went to the court's website to look at the prayer and that was in the Pelfrey case. It might have been in the district court decision, but I do know that this court has affirmed it and it's part of most legislative prayer cases where the prayers are online and citizens are getting their government feed that way. Plaintiffs in Establishment Clause cases don't make money. If you look on this record, none of these plaintiffs are after money. They ask the government time and again to please cancel this event or to make it inclusive. The plaintiffs showed up. Several of the plaintiffs showed up. Whether they're out for money, that's irrelevant. Nobody's suggesting they're out for money. I'm confused on why Mr. Rojas is being painted as someone who just wanted to file a lawsuit because No, no, not one. He didn't go. He went down there to observe what he knew would be a violation. Yes, and I don't think that That doesn't mean he wanted to file a lawsuit. Would he be able to have standing under this scenario if he hadn't stayed back? I think the point is there is a difference between getting injured and then going to sue. Getting injured then deciding I'm going to sue about it. That's one thing. Deciding I'm going to sue and then going to get injured so that I can sue, that's different. And I'm not sure, I mean, frankly, just to give you a lifeline here, I'm not sure you need to die in this ditch. I mean, like, you know, we've said in Kondratiev that one plaintiff is enough. Rojas, to me, is uniquely troubling. The Hales, I think, frankly, have a little bit more ground to stand on. I think what you might best advance your cause by meeting Ms. Sutherland's argument that even though the Hales said we're sort of members of the community, engaged members, we care about the violence, that they didn't actually go to participate in the vigil. They went to protest the vigil. And does that put them in Rojas land or are they better off than Rojas? You know, I know that Rojas, I don't need to die on this hill before because I do believe we firmly have standing with the Hales. But I am troubled by this idea that when the government takes it upon itself to violate the Constitution in a way that is, I don't know, at that time at least as palpable as this, to say that these citizens can't challenge that because they go. I mean, I just, I think that undermines the idea that the government is one of limited powers. What that's saying is that the government can freely and with impunity violate the Constitution. If you're warned, you can't show up and be a citizen and care about what's happening in your community. So whether they showed up to protest or to participate and then were dismayed because the whole hour was filled with prayer, there was no discussion about what they could do to help stop the crimes or anything like that. And it was all Christian prayer. There was no other prayer so Jewish members felt excluded. There was folks from the community that said, hey, this is being held on a high Jewish holiday. So we don't feel left, we don't feel included. Under the Supreme Court's precedence, that would warrant strict scrutiny when you have the government picking and choosing among religions. So it's not just the humanists that were affronted by this. There's, you know, we're not relying on Lemon any more than the district court did. But the district court said that this hour-long Christian worship service that mirrored a tent revival violates both the Establishment Clause and the purposes underlying the Establishment Clause, which go to the history and tradition. Can I ask you a quick question just about the test? And help me understand, you know, when I read the docket number 18-so-and-so, I mean, you were in no fault of your own. You got kind of whipsawed, right? I mean, like, you litigated this case in the district court under Lemon. Then comes Kondratiev. Then comes American Legion. Then comes Kondratiev II. And now I think sort of the landscape has kind of changed. And so I understand now you say, like, we don't need a test. Like, you don't want to bear hug Lemon, and I understand why. But, like, what's your proposal? Like, we can't just kind of freewheel it. Like, we've got to have some doctrinal test. Sure, and I maintain that Lemon is actually useful for novel situations. And I think I pointed to a Tenth Circuit case where there was some officer who made an off remark about, you know, praise the Lord and got sued. And the judge was like, well, what do I do with this? Like, praise the Lord, it's an off comment. Lemon was a useful thing to say, secular purpose, secular effect, let's go. When there is something that violates, like, the core reason we have the First Amendment or the Establishment Clause, in Engle, the court points out that it wasn't really just about non-preference and non-endorsement. That's kind of Lemony. This is about not degrading Christian religion. This is about not letting the government wayward minister and water down prayers for the masses and take this onto the mantle of itself. So I think that when you violate a core evil of the Establishment Clause, and I laid out, you know, those kind of core reasons we have the Establishment Clause to begin with. And I think that some of those are ways you could look at it. Certainly, we pass under Lemon. And I think that this court is just as bound by Lemon today as it was in the Kondratyev case one. Because Kondratyev two was just saying, hey, this is an old cross. We just decided an old cross. You have to reevaluate this. Yeah, but didn't American Legion say, I mean, true, American Legion was a monument case, but didn't in the recitation of the sorts of cases to which the history and tradition test, whatever that is, applies, monuments, displays, and ceremonies or services or some such? And why isn't this one of those? So you're referring to that footnote or that first line where it said, yeah, religious displays and then ceremonies. The ceremonies language clearly is different. The Supreme Court did not address religious ceremonies. And this court, again, considered Kondratyev to be a close call under Bladensburg and did a very close analysis of those factors and said, you know what, Lemon does not apply when we're dealing with an old monument. What the court is essentially saying from those cases is that it has a presumptive secular purpose because it's old. It has multiple owners. It's been transferred a couple times. We can't source this from the government, and the religious purpose is lost in antiquity. Secondly, the effect, you know, it's over time, it's taken on a new meaning. I think you pointed out, Judge Newsom, in your concurrence that I think or maybe the second opinion, that even Satanists had been using the cross as an indication that it was no longer just seen as Christian. And I think in this case, this was so overwhelmingly wrought with government purpose to endorse prayer. It said so in the letter. It said so on the Facebook page, which, by the way, the plaintiffs did not choose to encounter the Facebook message that invited them to come. And the mayor and the police chief both personally engaged my clients in inviting them to come and said, no, no, no, it's not just going to be prayer. We are going to talk about other stuff. So there are e-mails on this record that indicate personally inviting our clients, which I think takes it far beyond a Valley Forge and far beyond those just witnessing the cross thing. I mean, I think if you were to substitute my clients with, you know, Christian plaintiffs, and this was a Muslim prayer service or the police department in Berkeley, and they had, you know, some new age religion, I think you guys would probably find standing. And so I hope, I encourage you to try to look at this. I'm going to assume that what you didn't mean by that is that if the tables were turned, this panel would come to a different decision. Your Honor, it's a little bit challenging to feel after what happened in the Contract to You Have case, that withstanding, at least, that I'm not going to face substantial hurdles. And I feel a little bit concerned that if the Court is so concerned with Rojas' testimony, that he was about to witness a violation and went to go witness it and saw the violation happen, that the concern is that Mr. Rojas' testimony, rather than the government, this flagrantly violated the Constitution. And I think it's really important that there is fairness because I think, I mean, that's what the First Amendment requires. So I just, that's my hope. Okay. Very well. Yes. Thank you very much, Ms. Miller. Thank you. Oh, I've got one more question. Counsel, it's a bit more of a staple. We don't take this offensively. But there's sometimes a line between vigorous advocacy and antagonism. You seem to take this awful personally. I can assure you there's not a member of this Court who takes this personally. And I like your zeal and everything, but it's not about you. And it's not about us. It's about the issue and the facts. And the longer and better we can keep it about that, the more conducive to what we're all here for, is a correct decision, if you believe it. And I'm like Jim Newsom. Your argument about if it was Muslims that are New Age Berkeley. I'll let Berkeley speak for itself. But, you know, that gets close to being offensive. And it's not going to make any difference to us when we decide the case. But at the same time, you're young. And for future purposes, just in case there are other people who can't distinguish the aggregate from the issues, you might want to think about that. I appreciate that, Your Honor. And I do have a lot of zeal. I think partially because I've been doing this law for a decade and just sort of, you know, feeling like when I see a violation that feels this egregious to be here, I am taking it personally and I appreciate that professional advice and will take it to heart. And you need to keep in mind our argument that the questions are to help us and they're designed to be about consciously or subconsciously. They're designed to be about what we perceive to be weaknesses in the case. That doesn't mean that we are adopting those weaknesses in the decision. There is a reason that the attorney who gets the most questions, they say, people who've studied it, often ends up losing the case. That's because we're trying to prove the weakness. We're trying to give an opportunity. When I was, and I did quite a bit of it, the first thing that came to my mind when I got the question was thank you. It gives me an opportunity to try to disabuse you of that totally illogical, ridiculous position that you are formulating in that direction. But I didn't say that. And, you know, I'm glad you specialize. It gives us the benefit of your specialization and expertise. Well, I appreciate that. Thank you. And with that, I will turn it back over to Abby. Thank you, Ms. Miller. Very well. Thank you so much. Ms. Sutherland? Abby? You guys have seen one another before? Just two or three points on standing and two or three points very quickly on the establishment clause. With regards to standing, I do want to make clear here that municipal taxpayer standing is not an issue in this case. And so the claim that there could be taxpayer standing, it can't be determined here. It was dismissed. That claim was dismissed at the motion to dismiss stage for failure to make proper allegations. It was never appealed. And so standing has to lie on the facts and testimony that have been discussed today. I did just want to point out that with regards to the claim of exclusion, there is evidence in the record that indicates that when a private citizen had reached out to Chief Graham, he put them in contact with the private organizers and strongly encouraged that individual to take part in helping plan and lead the event. The record is devoid of any evidence that the plaintiffs attempted to help lead or participate in planning the vigil. I think had they done so, they may not have felt excluded here. I just think it's important to note that. I also wanted to mention two lower court opinions in this circuit. I think in their attempt to reconcile what is obviously very confusing standing precedent in the circuit and others on the Establishment Clause. The first is American Atheists Incorporated v. Levee County. It was decided by the Northern District of Florida in 2017. And in that case, the district court had found that the plaintiff lacked standing for his past alleged injury because it was a single event and there was testimony that he had encountered the monument purposely. And in an earlier case or a much older case, Alabama Freethought Association v. Moore. Also decided by the Northern District of Alabama in 1995. In that case, it involved the Ten Commandments display in the courtroom. And in attempting to reconcile precedent, the court found that here, the plaintiff's momentary exposure to the monument or to the commandments in the courtroom without Moore was insufficient to support standing. The court actually noted that there was no evidence that that plaintiff would return to the courtroom. And based upon that, the court did not find any type of metaphysical or spiritual injury. Can I ask you a standing question? So forget about Rojas. The Hales who said that they were community members, you know, were concerned about the violence, would love to, you know, sort of participate in a vigil. And I'm characterizing, I'm paraphrasing. Would love to participate in a vigil, but went and felt like they were excluded from this one. Given our precedent that says, in any event, that you don't have to change your behavior to have standing, right? That's, I mean, I think it's pretty clear from Raven and Kondratieff that we do not require a plaintiff to, like, walk around the park, right? What more would the Hales needed to have said to get them standing? I think here what makes this case distinguishable from one where an individual had indicated from the very beginning that they wanted to be a part of the vigil, they expressed interest in participating, even planning, and then were either rejected and prevented from participating and or showed up to participate. Those facts are very different than plaintiffs here who said from the outset, we heard about the vigil and we wanted to attend to see the violation. They then testified later that they wanted to be a part of it, that they felt excluded. But their intent from the outset is very clear. Their intent was to attend the vigil to oppose what they believed would be a constitutional violation. I think that's an interesting conflict. If you go with the intent to oppose it, how then can you also be excluded? So I guess, though, the difference is, I feel like we might just be slicing the bologna a little thin. I mean, if they go knowing they're going to be offended, but we're going anyway. We're going to like knuckle up and go. We're going to be offended, but we're going to go. That's okay, it sounds like. Now you've got standing because you just kind of, you know, you bellied up to the bar and you went. But if you go with the intent to be offended, then that's no. You see how razor fine that distinction seems? It is razor fine. I would submit to you that typically these cases are determined on that type of fact scenario. Many times they turn. You can have two very similar cases, and one fact such as they won't return to the monument again, or they will, is the determining factor. Also, with regards to exclusion, writing is spoken on metaphysical and spiritual injury or harm. The Supreme Court has been very clear about offense and exclusion, and I think there's a difference here. And I hope that we made that clear in our brief. A one-time offense or exclusion, which the Supreme Court has denounced as sufficient for standing, versus a metaphysical and spiritual harm, which every time that has been found, there has been regular contact, which would more understandably result in that type of injury. An injury sufficient to converge standing. If I could, I just want to read a quote from Judge Corsich on standing in the American Legion case because he attempts to summarize some opinions offered by justices over the years on this issue. So I think in fairness, just because we've let you go longer than I think we let Ms. Miller know, I know about the Corsich concurrence. I think my colleagues do as well. We can read that for ourselves. That's all good. Thank you so much. Thank you. Okay, very well. Well done, both sides. Thank you so much. That case is submitted. We will be in recess until tomorrow morning at 9 a.m. All rise. Thank you. All right. We'll just be in the hallway. All right. Thank you very much. Yes sir.